**INTERNATIONAL RESOURCE
RECOVERY, INC.,
Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Rolloffs Hawaii, Inc., Intervenor.**

No. 04–154 C.

United States Court of Federal Claims.

Filed Under Seal Feb. 9, 2005.

Reissued Feb. 17, 2005.[1]

1. An unredacted version of this Order was issued under seal on February 9, 2005. The Order issued today incorporates some of Defendant's proposed redactions. This redacted material is represented by brackets [ ].

Jeffrey I. Gdanski, Pomona, New York, for Plaintiff. Scott Gdanski and Sam Z. Gdanski, Of Counsel, for Plaintiff.

Stephen C. Tosini, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant. Capt. Scott N. Flesch and Lt. Col. Thomas L. Hong, Army Counsel, Arlington, Virginia, for Defendant. Donald A. Tobin, Bastianelli, Brown & Kelley, Washington, D.C., for Intervenor.

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR A PERMANENT INJUNCTION

WILLIAMS, Judge.

This post-award bid protest comes before the Court on the parties' cross motions for judgment on the administrative record (AR) and on Plaintiff's motion for a permanent injunction against continued performance of a contract for trash pick-up services.[2] This Court denied Plaintiff's motion for a preliminary injunction, finding that Plaintiff, the incumbent contractor, had failed to comply with a mandatory requirement of the solicita-

2. This case also includes claims under the Contract Disputes Act (CDA) relating to Plaintiff's prior contract, but these claims are not before the Court in the pending motions.

3. The Court issued other opinions in this action, one granting supplementation of the Administrative Record with depositions of the contracting officer and Plaintiff's principal, 59 Fed.Cl. 537

tion calling for a mobilization plan and that the Army was not obligated to waive that requirement for incumbents. *Int'l Res. Recovery, Inc. v. United States,* 60 Fed.Cl. 1 (2004).[3]

In the pending motion, Plaintiff again argues that because it was the incumbent and the Army knew its capabilities, it satisfied the solicitation's requirement for a mobilization plan. Because the Court squarely rejected this argument in denying a preliminary injunction and no new evidence warrants revisiting that claim, it is barred under the law-of-the-case doctrine. Plaintiff further argues that the agency's rejection of its proposal was arbitrary and capricious for a myriad of additional reasons. Specifically, Plaintiff alleges that the contracting officer (CO) was biased against it and knowingly failed to correct its inaccurate past performance evaluation, rated it under a stricter standard than that applied to other offerors, conducted improper discussions with the awardee and acted in bad faith in evaluating Plaintiff's proposal.

The Court concludes that the CO erred in failing to require the Technical Evaluation Committee (TEC) to reevaluate Plaintiff's past performance in light of a major change in the status of one of Plaintiff's past performance references—the conversion of a previous termination for default to a termination for convenience and a settlement agreement in a Board of Contract Appeals litigation requiring that such past performance evaluation be upgraded. That error, however, did not prejudice Plaintiff here because the CO, who was also the source selection authority, upgraded Plaintiff's past performance rating and documented that rating, and the source selection decision was driven by other factors. This error on the CO's part, as well as his other conduct in the prior and current procurement, does not demon-

(2004), a second, denying supplementation of the AR with documentation indicating *inter alia,* whether the Army may have known information which was required to be in IRRI's proposal through other sources, 60 Fed.Cl. 428 (2004), and a third, denying Defendant's motion to strike exhibits relating to bias on the part of the CO. 61 Fed.Cl. 38 (2004).

strate bias or bad faith. Nor has Plaintiff established that the Army engaged in disparate treatment of offerors or conducted improper discussions with the awardee. Accordingly, the Court denies Plaintiff's motion for a permanent injunction and grants Defendant's cross-motion for judgment upon the Administrative Record as to the bid protest.

### Background [4]

#### Plaintiff's Prior Contract

On June 29, 2001, the Army awarded Plaintiff, International Resource Recovery, Inc. (IRRI), contract number DAPC50–01–C0027 for refuse collection at industrial sites on military bases on Oahu, Hawaii. Plaintiff successfully completed performance of this contract, and the agency exercised options to extend performance.

#### The Instant Solicitation

On December 31, 2002, the Army issued a new solicitation for refuse services, number DABQ06–03–R–0002, stating that the award would be made to the offeror representing the best value to the Government. AR Tab 15, at 2.

The evaluation factors were listed as follows:

1. Technical Capability
   a. Project Staffing
   b. Mobilization/Phase–In
2. Quality Control
3. Performance Risk
   a. Past Performance
   b. Work Experience
4. Price

AR Tab 13, Attachment 3, at 1. Price was equal in importance to the combined factors of technical capability, quality control, and performance risk. AR Tab 13, Attachment 3, at 2. The solicitation explained that "the lowest priced proposal or the proposal receiving the highest evaluation rating might not receive the award," because "subjective judgment on the part of the Government is implicit in the process of the best value determination." *Id.* at 5.

Under the Technical Capability factor, Subfactor (b) Mobilization Plan, the solicitation required an offeror to explain in detail its mobilization plan and to include documentation of financial capability to acquire the necessary vehicles and equipment with prospective vendors, list the type and quantity of vehicles to be utilized under this contract, and whether they were to be leased, purchased, or owned, as well as to state the number of containers to be owned or acquired.

The solicitation provided:

The Government will evaluate and rate the content, effectiveness and probability of success of the offeror's mobilization plan. Mobilization plans will be considered in the best value trade off decision. Supporting documentation to confirm equipment acquisitions and realistic timetable are *major areas of scrutiny* by the Government.

AR Tab 13, Attachment 3, at 2–3 (emphasis added).

The solicitation advised offerors to submit their best offer from a price and technical standpoint at the outset, because the Army intended to award the contract without discussions. AR Tab 13, Attachment 3, at 5. The Army reserved the right to conduct discussions if the CO later determined it to be in the Government's best interests.

The solicitation also instructed offerors to provide performance risk information on all similar federal, state, municipal, and commercial contracts within the past three years, including the offeror's experience in performing contracts of similar scope and value as well as the past performance ratings on those contracts. The source selection plan provided that the following color code rating sys-

---

4. This factual background is derived from the AR, as supplemented by the depositions of COs Jaber and Koike, the declarations of contract specialist Bernice Homan, former CO Mary Engebretson, and CO Jaber, the final arbitration award decision in *Horizon Waste Servs. of Haw. Inc. v. Int'l Res. Recovery, Inc.*, No. 02–0089A, dated November 7, 2003, excerpts from deposi-

tion and trial testimony of CO Jaber in *Int'l Res. Recovery, Inc.*, ASBCA No. 53595, dated January 30, 2003, correspondence between CO Jaber and IRRI in October 2001, and the settlement agreement between IRRI and the Government in *Int'l Res. Recovery, Inc.*, ASBCA No. 53595, dated March 19, 2003.

tem would be used to assess the elements in the Technical Capability/Quality Control evaluation and the proposal's overall rating:

Blue (Exceptional)

Green (Highly Successful)

Yellow (Acceptable)

Pink (Minimally Acceptable)

Red (Unacceptable)

AR Tab 15, at 7. Similarly, a color code rating system was to be used to assess the past performance and work experience factors and the performance risk overall rating as follows:

Blue (Very Low risk)

Green (Low Risk)

Yellow (Moderate Risk)

Pink (High Risk)

Red (Very High Risk)

Gray (Unknown)

*Id.* at 8.

### Plaintiff's Initial Proposal

Plaintiff was among seven offerors to submit initial proposals. Plaintiff's initial proposal did not include any document designated as a mobilization plan. Rather, Plaintiff's proposal stated that IRRI "ha[d] all personnel, vehicles, equipment, tools, and containers on hand and in-place to perform the services required by this contract." AR Tab 16, at 7. Plaintiff submitted a spreadsheet listing the type and number of vehicles it planned to use to perform the contract but did not indicate whether its vehicles were owned or leased. Although Plaintiff represented it would acquire a new frontloader, it did not provide documentation supporting its financial capability to acquire the vehicle. *Id.* at 8. Regarding the containers that Plaintiff planned to use, Plaintiff stated that it would supply compactors and rolloff containers as required by technical exhibits 1 and 2 to the solicitation. *Id.* at 12–13. These exhibits listed the number and type of containers required at each refuse collection location and provided monthly pick-up schedules. AR Tab 12, Amendment 7. Plaintiff did not indicate whether it owned or leased its containers.

### The Awardee's Initial Proposal

Rolloffs Hawaii, Inc. (Rolloffs) submitted an initial proposal containing alternative mobilization plans. Under the first mobilization plan, Rolloffs proposed the precise number of frontloaders, rolloffs, trucks, various size containers and rolloff bins, and specified which bins, compactors, and rolloff bins were owned or would be purchased. AR Tab 21. Under the second mobilization plan, Rolloffs proposed to use the same equipment and purchase some containers from IRRI, the incumbent. *Id.* Rolloffs represented that of its [ ] frontloader and rolloff vehicles, [ ] percent were owned and the remaining [ ] percent were leased. *Id.* To support its financial ability to acquire the necessary equipment, Rolloffs submitted a letter from Auto and Equipment Leasing Company of Hawaii, stating that Rolloffs was an "excellent credit risk" and that all "vehicle and equipment lease payments have been made on a timely basis." *Id.*

### Amendment 8

On May 29, 2003, the Army issued Amendment 8 to the solicitation—which allowed the Army to purchase containers from the contractor at the expiration of the contract's base period and each option period. The agency had not been able to purchase containers under the prior contract. Koike Dep. at 39–40.

On June 16, 2003, Plaintiff submitted a revised proposal in response to Amendment 8 and claims that it submitted a mobilization plan from a prior contract in this revised proposal. The testimony of IRRI's principal regarding this submission is inconsistent. On one hand, he testified that he did not believe IRRI needed to submit a mobilization plan, that the previous CO advised him that incumbents need not provide mobilization plans and that he "never had required [a mobilization plan] when [he] was the incumbent contractor, so [he had] never submitted one when [he] was the incumbent contractor." Johnson Dep. at 13. On the other hand, Plaintiff's principal claims to have transmitted two additional faxes in response to Amendment 8 containing a prior mobilization plan IRRI had submitted for the 2001 procurement, but the Army's records do not

indicate that these faxes were received, and the Administrative Record did not include these faxes. Johnson Dep. at 18–19; AR Exs. 2–C, 2–D, 17,18. As such, the record is unclear as to whether IRRI in fact submitted the prior mobilization plan in response to Amendment 8. But even if it had, IRRI's prior mobilization plan was not responsive to the current solicitation because, as Plaintiff's principal testified, it was drafted "before we . . . had acquired and paid for all of our equipment that . . . we owned after the solicitation was issued." Johnson Dep. at 18.[5]

In June 2003, Rolloffs submitted a revised proposal in response to Amendment 8, this time including a single mobilization plan. This plan added a frontloader to the vehicles that Rolloffs would use to perform the contract and revised the number of containers which would be acquired. AR Tab 21. Rolloffs' mobilization plan explained that [ ]. *Id.* In addition, Rolloffs submitted a current letter from Consolidated Fabricators, the vendor from whom Rolloffs would purchase containers, stating that Rolloffs was an "excellent credit risk," that it "would be happy to fulfill Rolloffs' bin needs at any time." Consolidated Fabricators also stated that it could supply containers to Rolloffs within a [ ] to [ ]-day period. *Id.*

### The Army's Alleged Discussions with Rolloffs

The solicitation called for an offeror to submit in its proposal, "the estimated annual tonnage it used in preparation of its pricing proposal." AR Tab 13, Attachment 3, at 4. Rolloffs' proposal stated that it had the capacity to remove [ ] tons of trash annually, although the solicitation requested tonnage figures on a monthly basis. AR Tab 21; AR Tab 13, Amendment 3. The Army contacted Rolloffs' principal, Linda Henriques, to "obtain clarification on [Rolloffs'] proposed Annual Tonnage," AR Tab 27, believing that Rolloffs had inadvertently "inserted what appeared to be monthly estimates rather than annual estimates." AR Tab 28, at 9. Ms. Henriques clarified that "the proposed tonnage figure of [ ][was] their estimated tonnage per month, not per year." AR Tab 27.

### The Army's Selection of Rolloffs as the Awardee

IRRI's price was lower than that of Rolloffs. Under the technical capability factor, there were two subfactors: project staffing and mobilization plan. AR Tab 13, Attachment 3, at 1. The mobilization plan was more important than project staffing. *Id.* Plaintiff received a Red or Unacceptable rating on its mobilization plan, a Pink or Minimally Acceptable rating on its project staffing, and a Red or Unacceptable rating on its overall technical capability. AR Tab 28, at 9.

Under the factor performance risk, there were two subfactors, Past Performance and Work Experience. IRRI's overall rating for Performance Risk was Pink/High Risk and its Past Performance Risk rating was Pink/High Risk. The source selection decision explained IRRI's High Risk rating:

- The following recent past performance ratings were considered in the evaluation and are listed in descending order of weight based on similarity in scope and magnitude:
  - *Marginal:* Industrial Refuse Collection at Various Army Installations on the Island of Oahu, HI, Total contract amount: $3,787,816.32. This contract carries significant weight since it is the current contract. The performance problems under this

---

5. Defendant has proffered records concerning Plaintiff's principal's felony conviction and plea bargain for mail fraud associated with defrauding his company. Defendant contends that the Court need not go outside the record, but seeks to introduce these records "to the extent that the Court weighs the credibility of IRRI's principal's statements against the credibility of the relevant government officials' testimony"—a procedure the Court in *IRRI IV* suggested it could not do. 61 Fed.Cl. at 43 n. 14 ("to the extent that allegations of bad faith involve a credibility determination, such a determination cannot be resolved on

summary judgment."). Neither party has requested the Court to conduct an evidentiary hearing, and the Court cannot conduct a credibility assessment on this written record. *Id.* at 43. In any event, the record as a whole need not be supplemented yet again since IRRI has not shown that its claimed revised proposal complied with this solicitation. As such, Defendant's request to supplement the record with the Waiver of Indictment, Notice of Filing Plea Agreement, the Statement of Defendant's Constitutional Rights and the Information in *United States v. Johnson*, CR 96–970 (C.D.Calif.1996) is denied.

contract include numerous oil spills from faulty vehicles, labor violations, required insurances were cancelled three times for non-payment, complaints from subcontractors seeking payment relief, filing a false claim, the issuance of a total of 42 contract discrepancy reports, 16 issued during the current rating period (01 Jan 03—present), most of which were validated.

- *Marginal:* Residential Refuse Collection Services for Various U.S. Army Housing areas in Hawaii, Total contract amount $829,040.00. Under this contract, the offeror failed to take prudent actions to assure continuity of services when its subcontractor ceased performance. The subcontractor had provided ample warning of its plan to stop performance if payment of approximately $350,000 was not received. Though the offeror had repeatedly assured the Government that it would be taking over the contract with its own resources or secure another subcontractor, it failed to timely execute either plan.

- *Exceptional:* Refuse and Recycling Services Agreement, Total contract amount: $691,200.00

- *Satisfactory:* Refuse Service Agreement, Total contract amount: $353,712.00.

- *EXCEPTIONAL:* WASTE REMOVAL & DISPOSAL, TOTAL CONTRACT AMOUNT: $262,160.00.

AR Tab 28, at 11.

Under the Risk subfactor Work Experience, IRRI was rated Yellow/Moderate Risk.

- The following experience reference was considered in the evaluation:

- Residential Refuse Collection Services for various U.S. Army Housing areas in Hawaii, Total contract amount $829,040.00. This contract carries little weight as it was almost totally subcontracted to a firm that provided all trucks, drivers and contract management.

AR Tab 28, at 12.

On October 30, 2003, the Army awarded the contract to Rolloffs. The source selection decision explained:

(1) IRRI–IRRI offered the lowest price and received a red/unacceptable technical capability rating, a yellow/acceptable quality control rating and a pink/high risk performance risk rating. Based on its rating for technical capability, the proposal is unacceptable as submitted. The solicitation clearly stated that the Government intended to award without discussions. IRRI failed to submit a complete and acceptable proposal. All offerors bear the risk associated with the failure to comply with the terms and conditions of the solicitation. Even if the Government were to open discussions and IRRI submitted the missing information resulting in an improved technical capability rating, its performance risk rating, based on its current and past performance, could not change. Therefore, IRRI would not be considered the best value because its high-risk performance risk rating creates considerable doubt and uncertainty for complete or successful contract performance that would off-set any price savings from their slightly lower priced offer.

AR Ex. 28, at 25.

By letter dated October 31, 2003, the Army informed Plaintiff that it was not the successful offeror because it had not submitted a mobilization plan. The Army cited Plaintiff's failure to explain how it would acquire a new frontloader and provide documentation supporting its financial capability to acquire the vehicle, list the number and type of vehicles and containers which would be used, and indicate whether vehicles were owned, leased or to be purchased. AR Tab 30, at 1–2. Rolloffs began performance on March 1, 2004. Rolloffs purchased containers and compactors for $387,252.52, frontloaders for $352,643 and rolloff trucks for $235,406, and spent $57,124 to ship this equipment to Hawaii. Rolloffs' total equipment expenses for this contract were $1,032,425.

### Facts Relating to Plaintiff's Allegations of Bad Faith and Bias

#### The Termination of Plaintiff's Prior Contract

Plaintiff was the prime contractor on a prior contract for residential refuse collection (Residential Contract) and Horizon Waste Services of Hawaii, Inc. (Horizon), was the subcontractor. CO Jaber was one of the contracting officers overseeing that contract.[6] There was a payment dispute between Plaintiff and Horizon.[7] Pl.'s Mot. Jud. AR, Ex. 1. On October 4, 2001, CO Jaber issued a cure notice to IRRI, stating that the payment dispute was endangering performance of the Residential Contract and informing Plaintiff that it had ten days until October 14, 2001, to resolve the dispute, ensure continued performance of the contract, or risk termination for default. Pl.'s Mot. Jud. AR, Ex. 3. On October 9, 2001, Horizon ceased to perform the Residential Contract, and CO Jaber determined that Horizon's work stoppage resulted from nonpayment by Plaintiff. In an October 10, 2001, letter to CO Jaber, Plaintiff characterized Horizon's work stoppage as a strike, and informed CO Jaber that it was training a replacement workforce. Pl.'s Mot. Jud. AR, Ex. 5.[8] On October 10, 2001, IRRI requested to work extended hours to pick up trash, but CO Jaber denied this request. Jaber Dep. at 10.

On October 11, 2001, the Army terminated the Residential Contract for default due to nonperformance in a letter signed by CO Jaber. The letter stated that only a small portion of the October 10, 2001, trash collections had been completed, that IRRI had not used equipment required by the contract, and that there was no assurance that the missed refuse collections could be performed or that the regular weekly collection schedule maintained. Pl.'s Mot. Jud. AR, Ex. 4.

Plaintiff appealed the default termination to the Armed Services Board of Contract Appeals (ASBCA), and on March 19, 2003, the parties entered into a settlement agreement. In this Agreement, the Government agreed to convert the termination for default into a termination for convenience and upgrade Plaintiff's past performance rating on the Residential Contract so that Plaintiff would not be rated unsatisfactory in any category. Pl.'s Mot. Jud. AR, Ex. 7. Specifically, the Agreement provided:

> The government further agrees to upgrade the performance assessment report (PAR) previously issued regarding the subject contract. The government agrees that the new ratings will be upgraded such that [Plaintiff] will no longer be rated as unsatisfactory in any category, and the narrative language associated with the rated category will be adjusted throughout to reflect this modification.

Pl.'s Mot. Jud. AR, Ex. 7 ¶ 1.[9]

#### The Evaluation of Plaintiff's Past Performance In the Instant Procurement

CO Jaber completed the past performance questionnaire for IRRI's Residential Housing

---

6. In support of its Motion for Judgment upon the Administrative Record, Plaintiff filed seven exhibits which it claimed provided the factual predicate establishing bad faith on the part of CO Jaber. The Court accepted Plaintiff's exhibits, finding that the exhibits sufficiently supported Plaintiff's allegations of bad faith to warrant supplementation of the record. *Int'l Res. Recovery, Inc. v. United States*, 61 Fed.Cl. 38, 43 (2004).

7. This was memorialized in an arbitration decision. *Horizon Waste Servs. of Haw. Inc. v. Int'l Res. Recovery, Inc.*, No. 02–0089A (Nov. 7, 2003), Pl.'s Mot. Jud. AR, Ex. 1. Plaintiff withheld payment from Horizon for work performed under the contract due to disputes as to which party was liable for paying state excise taxes and whether funds due to Horizon should have been redirected to unexpected start-up costs of the Industrial Subcontract. Pl.'s Mot. Jud. AR, Ex. 1, at 3. The arbitrator found that Plaintiff was not justified in withholding payment from Horizon, and ordered Plaintiff to pay Horizon $456,381.19 plus interest. *Id.* However, the arbitrator also awarded Plaintiff $136,395.24 as lost profits for Horizon's breach of its duty of good faith and fair dealing based upon Horizon's false statements about Plaintiff to the military and Horizon's other efforts to undermine the military's confidence in Plaintiff's ability to perform the contract. *Id.* at 7. Finally, the arbitrator found that Horizon was responsible for $31,640 in state taxes. *Id.*

8. CO Jaber testified that he did not believe IRRI was faced with a strike because Horizon had indicated it was going to stop work due to nonpayment. Jaber Dep. at 8–9.

9. The record does not include the PARs after they were to be upgraded.

contract on behalf of the Directorate of Contracting. AR Tab 25. That questionnaire indicated that this reference would not do business again with IRRI, that the overall performance was unsatisfactory. Finally the questionnaire stated: "IRRI failed to perform when the [subcontractor] ceased working. The [Government] subsequently terminated the contract for default." *Id.*

In the instant procurement, there were three evaluators on the TEC, Mr. Tamaru, Mr. Yonesaki, and Mr. Sato. Initial proposals were evaluated between February 26, 2003 and March 4, 2003. The TEC's overall consensus rating on Plaintiff's past performance which was completed on March 5, 2003, was Red or Very High Risk. Homan Dec. ¶¶ 3–5, AR Tab 22. In evaluating past performance, Mr. Sato rated IRRI Pink/High Risk and noted that the Residential Contract "was rated Unsatisfactory overall." Mr. Sato characterized this as a significant weakness. AR Tab 22. Mr. Yonesaki rated IRRI's past performance Red or unacceptable, noting two weaknesses:

- Past performance with similar experience, contractor's overall evaluation was "unsatisfactory" and with the "do business again" reply of "No".
- Based on payment problems to subktr (who was perform work) they ceased to continue, the contractor continued but failed to performed. [sic] The Gov't subsequently terminated the contract for default. Similar experience level as this solicitation. [sic]

AR Tab 22. Mr. Tamaru rated IRRI Red, or unacceptable, for past performance, characterized this as a significant deficiency and stated: "Contractor has had all unsatisfactory and marginal ratings on [its] last refuse collection at Fort Shafter." AR Tab 22.[10]

The effective date of the ASBCA settlement agreement between Plaintiff and the Government was March 19, 2003, so that settlement had no impact on the prior TEC ratings. After the initial round of technical evaluations was completed, the TEC members were advised of the settlement agreement on the Residential Contract, but they were not instructed to re-evaluate IRRI in accordance with that agreement. Jaber Dep. at 30, 33–34.

The TEC met again from July 30 to July 31, 2003, in order to evaluate offerors' revised proposals submitted in response to Amendment 8. However, this Amendment did not address past performance, and the revised proposals did not contain new information regarding an offeror's past performance. Homan Dec. ¶¶ 6–7. CO Jaber did not instruct the TEC to reevaluate past performance in light of this amendment because the settlement agreement was not "a document that was submitted in response to the solicitation," and TEC "evaluations were only done on the submittals." Jaber Dep. at 37.

CO Jaber himself changed the TEC's "unsatisfactory" past Performance Rating for IRRI to "marginal" as a result of the Settlement Agreement. CO Jaber testified:

Q. Who determined that IRRI was pink high risk in past performance?

A. I did.

Q. And when did you make this decision?

A. After the technical evaluation team had completed their review of the proposals.

Q. Was this also after the settlement agreement was reached?

A. Yes, it was.

Q. ... [D]id you rate IRRI as marginal in its residential refuse collection contract?

A. Yes, I did.

Q. ... [D]idn't the evaluators rate IRRI as unsatisfactory?

A. Yes, they did.

Q. So why did you rate them as marginal here?

A. Per the terms of the settlement agreement, the T4D [termination for default] was converted to a T4C [termination for convenience]. I, therefore, upgraded the technical evaluations original rating of red to pink—excuse me, to marginal.

Jaber Dep. at 77–78.

On October 30, 2003, CO Jaber inadvertently released IRRI's notification of elimina-

---

10. This referred to IRRI's prior contract for the services at issue and the Residential Contract.

tion from the competitive range to other competing offerors. Jaber Dep. at 17–18. Other offerors' notification letters were not inadvertently released.

### Discussion

#### Jurisdiction and Standard of Review

The Court of Federal Claims has jurisdiction to review post-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2004). The Court reviews an agency's actions in a bid protest under the standards in section 706 of the Administrative Procedure Act (APA). 28 U.S.C. § 1491(b)(4) (2004). The APA directs a reviewing court to overturn agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2004). The protestor must demonstrate that the agency's actions were without a rational basis or in violation of procurement law or procedure. *Info. Tech. & Applications Corp. v. United States*, 51 Fed.Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed.Cir. 2003). A "protester's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a 'best-value' procurement." *Banknote Corp. of America v. United States*, 56 Fed.Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed.Cir. 2004); *see also TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327–28 (Fed.Cir.1996) ("To prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999) (citations omitted).

#### The Standards for Injunctive Relief

■ The Court may issue a permanent injunction if a plaintiff establishes by a preponderance of the evidence that: (1) it has achieved actual success on the merits; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government and the intervenor; and (4) granting the injunction serves the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed.Cir. 2004); *Hunt Building Company, Ltd. v. United States*, 61 Fed.Cl. 243, 279 (2004).

#### Success on the Merits

##### Law of the Case

■ Plaintiff again asserts that IRRI, as the incumbent, did not specifically identify a separate mobilization plan because the agency was aware of its ability to mobilize. This argument has been fully considered and rejected. 60 Fed.Cl. 1 at 3, 6–7 (2004). "Under the doctrine of law of the case, 'a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation.'" *Augustine v. Principi*, 343 F.3d 1334, 1339 (Fed.Cir.2003) (quoting *Suel v. Sec'y of Health & Human Serv.*, 192 F.3d 981, 985 (Fed.Cir.1999)); *see also Stockton E. Water Dist. v. United States*, 62 Fed.Cl. 379, 393 (2004). In *Suel*, our appellate authority explained:

> Law of the case is a judicially created doctrine, the purpose of which is to prevent relitigation of issues that have been decided. *See Gould, Inc. v. United States*, 67 F.3d 925, 927–28 (Fed.Cir.1995). The doctrine operates to protect the settled expectations of the parties and promote orderly development of the case. *See Mendenhall v. Barber–Greene Co.*, 26 F.3d 1573, 1582 (Fed.Cir.1994); *Little Earth of the United Tribes v. Department of HUD*, 807 F.2d 1433, 1441 (8th Cir.1986). It "ensures judicial efficiency and prevents endless litigation. Its elementary logic is matched by elementary fairness—a litigant given one good bite at the apple should not have a second." *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 890 (Fed.Cir.1984).

192 F.3d at 984–85.

Here, the Court denied Plaintiff's motion for a preliminary injunction because Plaintiff failed to comply with a material solicitation requirement calling for a mobilization plan. The Court reasoned:

Plaintiff has claimed that the Army's rejection of its offer for failure to submit a mobilization plan was arbitrary and capricious because the Army knew its capability to mobilize since it was the incumbent. At first blush, Plaintiff's argument has a visceral appeal. How can an agency rationally disqualify an offeror for failure to submit a mobilization plan when that offeror as the incumbent was fully mobilized? The problem with Plaintiff's argument is that the solicitation clearly required detailed mobilization plans from all offerors without regard to status as an incumbent. GAO consistently has held that an agency is not required to overlook a flawed proposal on the basis of an offeror's prior performance as an incumbent. *Dylantic, Inc.*, 95–2 CPD P 197. Rather, it is well established that all offerors, including incumbents, are expected to demonstrate their capabilities in their proposals. *Id.; Management Technical Servs.*, 93–1 CPD P 432, 1993 WL 197594. IRRI contends that it did not have to submit a mobilization plan because as the incumbent, the Army was well aware of its ability to perform the contract and thus a plan specifying how it would carry out the contract was unnecessary. However, Plaintiff's failure to submit a plan left a void in the information to be evaluated—there was no documentation of Plaintiff's financial capability to acquire the equipment and no indication of the number and type of containers or whether the vehicles or containers were to be owned or leased—a significant matter where the Army had the option of assuming ownership of containers at the end of the contract. As such, the Army reasonably rejected IRRI's proposal.

*Int'l Res. Recovery, Inc.*, 60 Fed.Cl. at 6. This Court has clearly ruled that the Army's knowledge about Plaintiff's capability to mobilize from other sources did not displace the solicitation's requirement that all offerors submit a mobilization plan.[11]

11. Plaintiff's contention that the Army necessarily knew that vehicles and containers were owned because of an assignment of the proceeds of the

■ The law of the case doctrine does not apply when there is "new and different material evidence that was not presented in the prior action" or when there has been "an intervening change of controlling legal authority." *AFG Indus., Inc. v. Cardinal IG Co.*, 375 F.3d 1367, 1372 (Fed.Cir.2004). These exceptions do not apply here. Plaintiff does not cite evidence which the Court did not previously consider in support of this claim. CO Koike's deposition testimony that IRRI had all materials in place and did not need to mobilize is the sum of the evidence that the Court already considered. The Court concluded that this evidence would not displace the solicitation's requirement for a mobilization plan. *IRRI*, 60 Fed.Cl. at 6–7. Specifically, the court ruled:

[T]he discrete requirements governing the mobilization plan were clearly mandatory, and Plaintiff cannot simply read these provisions out of the solicitation. In describing the mobilization plan, the solicitation stated that "[t]he offeror *must* explain in detail" its mobilization plan and items which, "[a]t a minimum, the proposed plan *must* include," i.e. a description of mobilization procedures for containers/compactors/rolloffs, its workforce, vehicles including whether they were to be leased, purchased, or owned, and the number of containers owned, or to be acquired. Finally, the solicitation provided that the Army "will evaluate" the content, effectiveness and probability of success of the plan. As such, the requirement for submitting a mobilization plan had all the earmarks of a minimum mandatory requirement. *Cf. Gentex Corp. v. United States*, 58 Fed.Cl. 634, 650 (2003) (performance specifications which used the world "shall" and were stated to be threshold requirements were requirements).

Plaintiff claimed that it would have been impossible for IRRI to have submitted a written plan of how it was going to mobilize because it already had mobilized. The Court disagrees. Nothing prevented Plaintiff from communicating the identity

contract is not supported by the record. *See* Tr. Feb. 26, 2004, at 52–54.

and ownership of the vehicles and containers and supporting documentation in the manner detailed in the solicitation.

60 Fed.Cl. at 7 (emphasis in original).

Nor does Plaintiff's inconsistent suggestion that it submitted an old mobilization plan from a prior procurement in response to Amendment 8 warrant revisiting this ground of protest. The record is unclear as to whether Plaintiff submitted such a plan. In any event, the prior plan was not responsive to the instant solicitation's requirement regarding equipment ownership because the plan was drafted before IRRI allegedly acquired the equipment it was offering.

■ In short, because there has been no supplemental evidence which alters the court's prior conclusion and no change in the law since denial of the motion for preliminary injunction, the law of the case doctrine bars this claim. *Cf. Remed Recovery Care Ctrs. v. Township of Willistown, Chester County, Pa.*, 36 F.Supp.2d 676, 682 n. 5 (E.D.Pa.1999) (stating that a court may recast a preliminary injunction into a permanent injunction when there is no new evidence); *PDK Labs Inc. v. Ashcroft*, 338 F.Supp.2d 1, 6 (D.D.C. 2004) (stating that a court may convert a preliminary injunction into a grant of summary judgment where there is no new evidence and the court adapts the previous findings of fact or law to the summary judgment standard).

### Did the Army Engage in Disparate Treatment of Offerors?

■ Plaintiff alleges that the Army imposed more stringent mobilization plan requirements on Plaintiff than on Rolloffs.[12] Plaintiff contends that neither its proposal nor that of Rolloffs specified which containers were to be owned or leased, but that the Army overlooked this defect for Rolloffs while employing this omission to downgrade Plaintiff. Pl.'s Mot. Jud. AR, at 17. Rolloffs' mobilization plan listed the number and type of "Containers to be Leased/Purchased" to

perform the contract, and IRRI contends that this "either-or" approach meant that the Army did not know which of Rolloffs' containers were owned and which were leased. AR Tab 21. However, Rolloffs' mobilization plan represented that "[n]ew bins will be ordered, with the understanding the Army desires to own the bins at the end of the contract term and have the option to purchase bins during the contract." AR Tab 21. Rolloffs further noted that it "owned" in excess of 500 containers that were "available for immediate placement." AR Tab 21. Moreover, Rolloffs' mobilization plan included letters from the fabricator in response to Amendment 8, noting that the fabricator was willing to extend credit for the containers and promising to "supply the containers to Rolloffs Hawaii within a 60–90 day period." *Id.* CO Jaber interpreted Rolloffs' proposal to mean that Rolloffs would be able to transfer title of the containers to the Army at the conclusion of the contract. Finally, the source selection determination concluded that Rolloffs "will contact [the vendor] to arrange for purchase and delivery" of containers. AR Tab 28, at 14.

The Court's role in reviewing a bid protest "is not to second-guess the judgment of the government decisionmakers." *Gulf Group Inc. v. United States*, 61 Fed.Cl. 338, 353 (2004). An agency's decision will be upheld so long as it was not "clearly erroneous," and there was a rational basis for the decision. *Id.* (citations omitted). The Army's conclusion that Rolloffs would own its containers was not clearly erroneous since the firm's mobilization plan indicated that it would order containers with the understanding that the Army would purchase them at the end of the contract, and reflected its financial capability to purchase containers. AR Tab 21.

### Did the Army Hold Improper Discussions with Rolloffs?

■ Plaintiff asserts that the Army improperly conducted discussions with only one offeror, Rolloffs, and that had discussions

---

12. Plaintiff also claims that the Army relaxed requirements for a mobilization plan for another offeror, Si–Nor. Plaintiff points out that Si–Nor received a[ ] rating on its mobilization plan, even though that plan was incomplete, and argues

that Si–Nor should have received [ ] rating, the same rating that Plaintiff received. Unlike IRRI, Si–Nor did submit a mobilization plan, and IRRI has not established that Si–Nor's [ ] was irrational or prejudicial to it.

been held with IRRI, it could have provided the information it failed to submit in a mobilization plan. Pl.'s Mot. Jud. AR, at 29–30. This argument fails because the Army never conducted discussions with Rolloffs.

Plaintiff contends that the Army's inquiry as to Rolloffs' proposed estimated annual tonnage capacity for trash disposal constituted discussions. The Court does not accept this contention. The solicitation called for an offeror to submit the estimated annual tonnage it used in preparing its pricing proposal, but requested tonnage figures on a monthly basis. AR Tab 13, Attachment 3, at 4. Rolloffs proposed that it had the capacity to remove an annual tonnage of [ ] tons of trash. AR Tab 21; AR Tab 12, Amendment 2. In reviewing Rolloffs' proposal, the Army noticed that it appeared Rolloffs had inserted its *monthly* tonnage capacity, not the *annual* capacity required by the solicitation, and the Army contacted Rolloffs to clarify whether Rolloffs had submitted the monthly figure by mistake.[13]

The Federal Acquisition Regulation (FAR) defines "clarifications" as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." 48 C.F.R. § 15.306(a) (2002). Clarifications include " 'eliminating minor irregularities, informalities, or apparent clerical mistakes.' " *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1321 (Fed.Cir.2003) (quoting former 48 C.F.R. § 15.601 (1991)). Discussions, on the other hand, are "negotiations" between the Government and offerors which, in a competitive procurement, take place after the establishment of a competitive range. *Info. Tech. & Applications Corp.,* 316 F.3d at 1321 (citing 48 C.F.R. § 15.306(d) (2002)). The FAR defines negotiations as:

[E]xchanges ... between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract.

48 C.F.R. § 15.306(d) (2002). In *JWK Int'l. Corp. v. United States,* 52 Fed.Cl. 650 (2002), this Court recognized the distinction between clarification and discussions, quoting GAO:

[Clarifications] are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal.... Discussions, on the other hand, occur when a contracting officer indicates or discusses with each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal that could be altered or explained to enhance materially the proposal's potential for award.

52 Fed.Cl. at 661 (emphasis added).

The Army inquired into Rolloffs' estimated tonnage figures for the sole purpose of ascertaining whether the firm had quoted monthly, or annual tonnage figures and did not give Rolloffs an opportunity to alter its proposal. This is a quintessential example of a clarification. *E.g., PADCO, Inc.,* B–289096.3, 2002 CPD ¶ 135, 2002 WL 1980124, at *6 n. 1 (agency noted apparent arithmetic error in offeror's cost proposal and requested clarification); *Jettison Contractors, Inc.,* B–242, 792, 91–1 CPD ¶ 532, 1991 WL 107957, at 1 (agency clarified apparent clerical and mathematical errors in offeror's bid, lowering the bid price).

### Did CO Jaber Act in Bad Faith?

■ Plaintiff claims that CO Jaber acted in bad faith when he did not instruct TEC evaluators to reevaluate Plaintiff's past performance in light of the Settlement Agreement, which had converted the default termination on the Residential Contract to a termination for convenience. The technical evaluators were reviewing revised proposals in response to Amendment 8 in July, and

---

**13.** The Administrative Record is clear. The Army contacted Rolloffs' principal, Linda Henriques, to "obtain clarification on [Rolloffs'] proposed Annual Tonnage," believing that Rolloffs had inadvertently "inserted what appeared to be monthly estimates rather than annual estimates." AR Tab 28, at 9. Ms. Henriques clarified that "the proposed tonnage figure of [ ][was] Rolloffs' estimated tonnage per month, not per year." AR Tab 27.

this upgraded past performance rating had been available since the previous March. CO Jaber did not ask the evaluators to re-evaluate past performance because the Settlement Agreement information "wasn't a document that was submitted in response to the solicitation. Their evaluations were only done on the submittals." Jaber Dep. at 37.

CO Jaber's determination that the information in the Settlement Agreement was not part of the Amendment 8 submittals and therefore could not have been evaluated is wrong. Nothing prevented CO Jaber from requesting a reevaluation of offerors' past performance based upon the upgraded past performance report. Indeed, FAR 15.305(a)(2)(ii) requires the Government to consider past performance information provided by offerors "as well as information obtained from *any other* sources, when evaluating the offeror past performance." 48 C.F.R. 15.305(a)(2)(ii) (2003) (emphasis added). As GAO has recognized, "some [past performance] information is simply too close at hand to require offerors to shoulder the inequities that spring from an agency's failure to obtain and consider the information." *Int'l Business Systems, Inc.*, B–275554, 97–1 CPD ¶ 114 at 4 (citations omitted).

Further, the ASBCA Settlement Agreement obligated the Government to upgrade the past performance rating on the Residential Contract, so that Plaintiff would no longer be rated unsatisfactory in any category related to that contract. A termination for default is a "drastic sanction" which can have a severe negative impact on a contractor's eligibility for other contracts. *Lisbon Contractors v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987).[14] IRRI's revised past performance rating should have been reflected in a revised past performance questionnaire at the evaluator level and considered in the evaluation in lieu of what CO Jaber knew

was an erroneous original questionnaire, especially when the TEC was reconvening to consider revised proposals, and months remained before the award. However, this error was ameliorated at the source selection level by CO Jaber, who upgraded IRRI's past performance and risk ratings and documented these revised ratings.[15]

This error regarding IRRI's past performance on the Residential Contract was not fatal to the procurement decision at issue because this piece of the evaluation did not drive the rejection of IRRI's proposal. Rather, IRRI's failure to comply with a mandatory solicitation requirement for a mobilization plan, and its marginal past performance on another far more significant past performance reference—the incumbent contract, the most heavily weighted performance reference—doomed IRRI's proposal. That past performance reference reflected IRRI's numerous oil spills from faulty vehicles, labor violations, cancellation of required insurance three times for nonpayment, complaints from subcontractors seeking payment, submission of a false claim, and some 42 discrepancy reports. IRRI's minimally acceptable project staffing, and moderate risk in its work experience, combined with these deficiencies support the rational basis for the Army's selection decision.

Nor does the CO's error establish the CO's bias or bad faith. Plaintiff's burden of demonstrating bad faith on the part of CO Jaber is a heavy one. *Orion Int'l Tech. v. United States*, 60 Fed.Cl. 338, 344 (2004); *IRRI*; *Libertatia Assocs. Inc. v. United States*, 46 Fed.Cl. 702, 706 (2000) (citing *Spezzaferro v. Fed. Aviation Admin.*, 807 F.2d 169, 173 (Fed.Cir.1986)). The Federal Circuit recently articulated that "to prevail on an allegation of bad faith, [the protestor] must show 'almost irrefragable proof.'" *Galen Med.*

14. See generally, John Cibinic, Jr. and Ralph Nash, *Administration of Government Contracts*, 3d ed., at 902 (since a default termination not infrequently leads to the contractor's financial ruin, the Court of Claims has branded default termination a species of forfeiture). *De Vito v. United States*, 188 Ct.Cl. 979, 413 F.2d 1147 (1969).

15. CO Jaber himself, as the source selection official, upgraded IRRI's overall past performance rating from "unsatisfactory" to "marginal" and from "very high risk" to "high risk." The documented award decision, as well as CO Jaber's testimony reflect that he did consider the upgraded rating in making his selection. FAR 15.305(a)(ii) requires the source selection authority to determine the relevance of similar past performance information.

*Assocs. Inc. v. United States*, 369 F.3d 1324, 1337 (Fed.Cir.2004) (citation omitted). "Irrefragable proof" has been equated with "clear and convincing evidence ... of some specific intent to injure the plaintiff." *Id.* at 1330. On this Administrative Record as supplemented, Plaintiff has not made such a showing. The CO's bypassing the TEC and upgrading IRRI's past performance rating himself, at the source selection level, does not demonstrate a specific intent to injure Plaintiff.

Nor does Plaintiff's litany of other conduct by CO Jaber prove bad faith or bias. IRRI argues that CO Jaber was unduly influenced by Horizon, its subcontractor on the Residential Contract, which led him to believe that IRRI had not paid Horizon. However, *Horizon's* undue influence on CO Jaber does not equate to *CO Jaber's* bias. Plaintiff's allegation that CO Jaber terminated its Residential Contract without providing IRRI sufficient time to cure also does not prove bias because the record reflects that IRRI had not been able to pick up trash as scheduled, and this condition could not continue. Plaintiff also cites the fact that Horizon was on strike during the Residential Contract and CO Jaber refused to allow IRRI to work extended hours. The record is unclear as to what the cause of the Horizon work stoppage was—CO Jaber did not believe Horizon was on strike and cites IRRI's nonpayment of Horizon, a matter an arbitrator resolved in Horizon's favor. Nor does the CO's inadvertent disclosure of IRRI's elimination to other offerors here establish bias or bad faith. In sum, the totality of circumstances Plaintiff cites does not constitute the requisite "almost irrefragable" level of proof necessary to establish bias or bad faith on the part of CO Jaber. *Id.* at 1337.

Plaintiff has not demonstrated actual success on the merits of its claims. A plaintiff that cannot show that it will actually succeed on the merits of its claim cannot prevail on its motion for injunctive relief. *Nat'l Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.*, 357 F.3d 1319, 1325 (Fed.Cir.2004). As the Federal Circuit has recognized:

> Although in some instances [t]hese factors, taken individually, are not dispositive' be-

cause the district court's conclusion results from a process of overall balancing, *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed.Cir.1988), a movant is not entitled to a preliminary injunction if he fails to demonstrate a likelihood of success on the merits. *See Amazon.com*, 239 F.3d at 1350 (noting that both "case law and logic" establish the likelihood of success on the merits and the irreparable harm factors as necessary showings to obtain a preliminary injunction). In other words, a court cannot use an exceptionally weighty showing on one of the other three factors to grant a preliminary injunction if a movant fails to demonstrate a likelihood of success on the merits.

*Id.*

### Conclusion

1.  Plaintiff's motion for a permanent injunction is **DENIED.**

2.  Plaintiff's request for bid preparation and proposal costs is **DENIED.**

3.  Defendant's Motion for Judgment on the AR with respect to the bid protest allegation is **GRANTED.**

4.  The Court has issued this Opinion under seal in accordance with the Court's Protective Order. The parties are directed to file any proposed redactions to this Opinion no later than **February 14, 2005.**

5.  The Court will convene a telephonic status conference on **February 16, 2005 at 2:00 pm ET**, to schedule further proceedings on the CDA claims.